**NATIONAL CABLE TELEVISION COOPERATIVE, INC.,**
Plaintiff,

v.

**VIACOM INTERNATIONAL, INC., Defendant.**

No. 98–2264–JWL.

United States District Court,
D. Kansas.

Dec. 31, 1998.

---

Karl Zobrist, Christian D. Stewart, Timothy G. Swenson, Blackwell Sanders Peper Martin LLP, Kansas City, MO, James D. Griffin, Blackwell Sanders Peper Martin LLP, Overland Park, KS, for National Cable Television Cooperative, Inc, plaintiffs.

Barbara A. Harmon, David J. Waxse, Shook, Hardy & Bacon L.L.P., Overland Park, KS, David P. Gersch, Irvin B. Nathan, Arnold & Porter, Washington, DC, for Viacom International, Inc., defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

By this action, plaintiff National Cable Television Cooperative, Inc. ("NCTC") seeks damages arising from defendant Viacom International, Inc.'s ("Viacom") alleged breach of contract. The matter is presently before the court on defendant's motion to dismiss or, in the alternative, for summary judgment (doc. 18). For the reasons set forth below, defendant's motion is denied.

### I. Facts

Plaintiff NCTC is a not-for-profit corporation organized under the laws of Kansas with its principal place of business in Lenexa, Kansas. Defendant Viacom is a Delaware corporation with its principal place of business in New York, New York.

Plaintiff represents approximately 960 cable television companies throughout the United States, 354 of which subscribe to the services offered by Viacom's MTV Networks ("MTVN") division. These program services include the MTV: Music Television, VH–1/Music First, and Nickelodeon cable networks. On June 13, 1995, MTVN's predecessor in interest, MTV Networks Affiliate Sales and Marketing ("MTV Networks AS & M"), entered into a contract with NCTC. By its terms, the contract obligated MTV Networks AS & M to distribute VH–1, MTV, and Nickelodeon to NCTC members, which, in turn, agreed to pay a negotiated license fee set forth in the "Rate Card" attached thereto.

Section 2(a)(ii)of the parties' contract, the provision primarily at issue in this case, regulates unscheduled rate increases. Specifically, that section provides:

> Upon no less than sixty (60) days prior written notice to Affiliate... [MTV Networks AS & M] shall have the right to increase, from time to time during the Term hereof, as part of a cable industry-wide rate increase or modification, the rates set forth [in the Rate Card] .... In such event, Affiliate may, by written notice to [MTV Networks AS & M] at least thirty (30) days prior to the Effective Date, terminate the Term hereof....

On June 3, 1997, MTVN informed plaintiff of its intent to raise the license fees. The increase was to be effective August 1, 1997. The parties' respective accounts of events following the rate increase notification diverge considerably. According to defendant, plaintiff's senior vice president, Frank Hughes, accepted the rate increase on plaintiff's behalf. In contrast, plaintiff contends that no such acceptance was communicated to defendant. Instead, plaintiff claims that Mr. Hughes, by letter and by telephone, questioned the validity of the increase, and requested verification that the rate hike was imposed as part of a cable industry-wide increase as plaintiff contends was required by the contract.

The parties' commercial relationship subsequently deteriorated. Apparently dissatisfied by defendant's response to its requests for information regarding the extent to which the increase applied to MTVN's contracting affiliates, plaintiff re-

fused to pay the increased rates. According to plaintiff, because defendant has failed to offer evidence that the increased rates were part of a "cable industry-wide" rate hike, plaintiff is obligated only to pay the previously agreed-upon rates. Defendant disagrees, maintaining that plaintiff waived its right to object to the increased rates by failing to timely reject the proposed increase. Defendant further contends that plaintiff's failure to remit the increased rates justifies defendant's refusal to admit new members under the existing contract.

On June 12, 1998, NCTC filed this action alleging that MTVN breached the contract by denying new members the right to distribute and exhibit the cable services provided by MTVN. Additionally, plaintiff seeks declaratory relief from this court to resolve the parties' obligations, duties, and effect of the disputed rate increase, if any, in light of § 2(a)(ii) of the parties' agreement.

## II. Legal Standard

Defendant moves to dismiss plaintiff's complaint, or, in the alternative, for summary judgment in its favor. "A motion to dismiss for failure to state a claim upon which relief can be granted must be converted into a motion for summary judgment whenever the district court considers matters outside the pleadings." *Lowe v. Town of Fairland, Oklahoma,* 143 F.3d 1378, 1381 (10th Cir.1998). District courts "have broad discretion in determining whether or not to accept materials beyond the pleadings." *Id.* Because both parties have attached materials beyond the pleadings, and because the court has considered those additional materials, the court will treat defendant's motion in light of the summary judgment standard.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important proce-

dure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Analysis

### A. Pleading Requirements

■ The court first addresses defendant's argument that plaintiff has failed to adequately plead the elements of an action for breach of contract. Because the MTVN/NCTC contract provides for the resolution of disputes in accordance with the laws of the state of New York, the court will apply the law of that jurisdiction here.[1] To state a claim for breach of contract under New York law, "a plaintiff must allege: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages resulting from the breach." *R.H. Damon & Co., Inc., v. Softkey Software Products, Inc.,* 811 F.Supp. 986, 991 (S.D.N.Y.1993). Defendant claims that plaintiff has failed to state a claim for breach of contract with respect to due performance, damages, and breach. The court considers each argument in turn.

■ First, the court disagrees with defendant's contention that plaintiff has failed to allege due performance. While it is true that plaintiff has refused to pay the amount of the disputed increase to defendant, plaintiff has continued to remit the original rates due under the contract. Plaintiff has done so because it believes that the rate hike was unjustified and thus that NCTC has fulfilled its obligations under the contract by paying the original, agreed-upon rates. If plaintiff is correct in this belief, it is indeed duly performing its obligations under the contract.

Furthermore, the court also disagrees with defendant's assertion that plaintiff failed to adequately allege defendant's breach. On the contrary, plaintiff's complaint specifically alleges that "Defendant Viacom has breached the contract between Plaintiff NCTC and Viacom's MTV Networks division by refusing to provide services at the rates specified in the agreement to Plaintiff NCTC's duly qualified new members." Apparently displeased with plaintiff's characterization of events, defendant insists that plaintiff must instead allege that defendant breached the contract by imposing the disputed rate increase. With this contention the court also disagrees. Plaintiff has explicitly stated that the action constituting the alleged breach from which this lawsuit arises is not just the imposition of the rate hike, which it implicitly alleges is a breach because defendant was not entitled to increase the rates, but instead, more specifically, is defendant's denial of new members under the existing contract because that is how plaintiff has suffered the effects of the breach. Defendant has cited no authority, and the court is unaware of any, to support its theory that the plaintiff must plead the facts from defendant's point of view. In short, plaintiff has adequately pleaded defendant's breach of the contract.

■ To the extent that plaintiff's complaint claims that as a "direct and proximate result of [defendant's] breach, NCTC has sustained damages in an amount in excess of $75,000," a mere assertion that the claim exceeds the jurisdictional threshold for a diversity case, plaintiff has failed to comply with the pleading requirements set forth in Fed.R.Civ.P. 8(a)(3). The court finds that plaintiff's assertion of damages suffered is insufficient, even under the generally lax standard of Rule 8's notice pleading requirements, to adequately inform defendant of the potential damages it may face.[2] Plaintiff is granted

---

1. Neither party disputes the validity of the contract's choice of law clause which provides that the contract is to be governed by the laws of New York.

2. The court finds unhelpful plaintiff's assertion that it has adequately pled damages by

claiming that the proposed increased rates would raise license fees for NCTC's members by over $250,000 per month. It is unclear from the complaint whether monetary damages are being claimed on plaintiff's behalf or on behalf of its subscribers. The court is,

leave to amend its complaint by January 15, 1999, to more clearly set forth the amount of its claim for damages and the basis on which they are claimed.

## B. Waiver

Defendant claims that plaintiff is estopped from asserting its rights under the contract because any such rights have been waived. Specifically, defendant claims that plaintiff waived its rights by: 1) accepting, via its authorized agent, the proposed rate increase, 2) unjustly enriching itself by collecting the increased rates from its subscribers but remitting only the original rates to defendant, and 3) failing to timely reject the proposed rate hike.

■ Under New York law, "[a] waiver is the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 303 (2d Cir.1996)(quoting *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 668, 436 N.E.2d 1265, 1270–71 (1982)). Waiver "may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage." *Dice v. Inwood Hills Condominium,* 237 A.D.2d 403, 404, 655 N.Y.S.2d 562, 563 (N.Y.App.Div.1997) (citations omitted). The issue of waiver "is generally a question of fact." *Id.*

■ A cursory review of the parties' representatives' declarations leads to the unmistakable conclusion that material issues of fact exist with respect to defendant's waiver defense. First, the facts allegedly supporting defendant's claim that plaintiff accepted the rate increase are far from uncontroverted. Indeed, whereas Elizabeth Posner, defendant's agent, claims that Frank Hughes agreed to the increase on plaintiff's behalf, Mr. Hughes contends that he made no such statement. In fact, Mr. Hughes claims that he merely advised Ms. Posner that NCTC would review the parties' contract to determine

therefore, uncertain as to whether this suit was brought in plaintiff's personal or repre-

whether such a rate increase was justified. The respective declarations of each parties' agents flatly contradict one another on a material fact issue, and thus indicate that summary judgment is inappropriate.

■ With respect to defendant's argument that plaintiff's collection of the increased rates without remitting the disputed amounts to defendant constitutes waiver, the court concludes that a material fact issue exists there as well. Plaintiff maintains that it is collecting the disputed increases from its subscribers in an effort to avoid "rate shock" in the event that this litigation produces an unfavorable result. Because a reasonable fact finder could determine that plaintiff's rationale, as opposed to defendant's waiver theory, is correct, plaintiff has demonstrated that a genuine issue of material fact exists with respect to plaintiff's motivation for collecting the disputed rates.

■ Similarly, defendant fails to meet its burden to show that there is an absence of a material fact issue with respect to its final waiver argument. Defendant claims that this court should rely on *USA Network v. Jones Intercable, Inc.,* 729 F.Supp. 304 (S.D.N.Y.1990) and rule that, as a matter of law, plaintiff's failure to timely reject the proposed rate hike constitutes waiver. Defendant urges this court to consider the "virtually identical" contractual provision at issue in *Jones Intercable* to determine that the increase in this case is binding on plaintiff. The relevant language in the *Jones Intercable* case provided as follows:

> On three (3) months' advance written notice, USA may change the rates, if any, set forth on the Basic service Schedule or Tiered Service Schedule, as the case may be. If such change increases the rate payable by Affiliate with respect to subscribers in a CATV System, then Affiliate may notify USA, within thirty (30) days of the giving of such notice, that Affiliate regards such

sentative capacity, and concludes that the plaintiff must clarify that issue.

change as unacceptable and wishes to terminate this Agreement solely with respect to any CATV System as to which such increase is applicable. In the event that Affiliate so notifies USA that such change is unacceptable under the provisions of this [section], this Agreement shall terminate on the date such proposed change becomes effective, unless within thirty (30) days of receiving Affiliate's notice, USA notifies Affiliate that USA has decided not to make such proposed change . . .

*Id.* at 309. The *Jones Intercable* court determined that time was of the essence under that contract, and concluded that, in light of the undisputed fact that the affiliate's notice of termination was "roughly twelve days late," the affiliate was bound to the rate increase due to its untimely rejection thereof. *Id.* at 310.

As noted by plaintiff, the contractual provision at issue in *Jones Intercable* is hardly "virtually identical" to the provision at issue here. Whereas § 2(a)(ii) of the MTVN/NCTC contract specifically includes the "cable industry-wide" clause, the *Jones Intercable* contract simply imposed a precise deadline without any qualifying language. In its papers, plaintiff claims that it contracted to specifically limit defendant's otherwise unfettered ability to impose rate increases by requiring that any such increase be "cable industry-wide." Plaintiff further contends that it purposefully rejected language similar to the clause in *Jones Intercable* during its preliminary negotiations with defendant so as to avoid the outcome of that case. In light of the substantial difference in the contractual language involved here, the court cannot simply rely on *Jones Intercable* to hold that, as a matter of law, plaintiff waived its rights under the contract by failing to timely reject the proposed rate increase.

## C. Interpretation of "Cable Industry–Wide"

The primary issue in this case appears to involve the interpretation of the "cable industry-wide" contract provision. Defen-

dant contends that this language contemplates the percentage of affiliates affected by the increase, whereas plaintiff maintains that the relevant point of reference is at the subscriber level. Defendant further argues that because the increase affected at least 90% of MTVN's affiliates, the rate increase was indeed "cable industry-wide." Plaintiff, on the other hand, concedes that while the percentage of affiliates affected may in fact exceed 90%, that figure is nevertheless short of 100%, and thus not "industry-wide."

The parties' differing interpretations of the "cable industry-wide" term indicates that the term is ambiguous. Under New York law, whether a contract is ambiguous is a matter of law to be resolved by the courts. *Readco*, 81 F.3d at 299 (citing *W.W.W. Assocs., Inc., v. Giancontieri*, 77 N.Y.2d 157, 162–63, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990)). A contractual term is ambiguous "where reasonable minds could differ on what a term means." *Id.* (citations omitted). No ambiguity exists, however, "where the alternative construction would be unreasonable." *Id.* Further, "where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." *Id.* (citing *Hudson–Port Ewen Assocs., L.P. v. Chien Kuo*, 78 N.Y.2d 944, 945, 573 N.Y.S.2d 637, 637, 578 N.E.2d 435, 435 (1991)).

The court notes that the parties' contrasting views with respect to the meaning of "cable industry-wide" differ on two conceptual levels. First, the parties disagree as to what group, affiliates or subscribers, the term "cable industry" refers. Further, the parties dispute the percentage of relevant consumers, whether 100% or something less, to which the rate increase must apply before it is considered "cable industry-wide." The contract contains no definitional section clearly designating the intended meaning of the disputed phrase, and the court finds that consideration of the contract as a whole

 

fails to remove the ambiguity from § 2(a)(ii). The court concludes that reasonable minds could differ as to the meaning of the term "cable industry-wide," and that neither party's interpretation is unreasonable. The court thus finds the contract ambiguous with respect to § 2(a)(ii), and cannot, as a matter of law, rule that either party's purported understanding of the term is correct.

In sum, if the facts are as argued by defendant, such that the proposed rate increase was indeed "cable industry-wide," plaintiff's failure to reject the increase might constitute waiver of its right to give notice of termination, and its subsequent failure to pay the increased rates could be considered a breach of contract. However, if the facts are instead as a fact finder might reasonably infer when cast in a light favorable to plaintiff, such that the proposed rates were not authorized under the contract, then the conclusion could be reached that not only did plaintiff not waive its right to give notice of termination but also that defendant breached the contract by refusing to provide services at the contract rate. The court concludes, therefore, that when plaintiff is accorded all inferences to which it is entitled, there remain material facts in dispute which preclude summary judgment with respect to the meaning of the term "cable industry-wide."

### D. Remaining Affirmative Defenses

 In its motion, defendant raises the equitable defense of "unclean hands." Specifically, defendant claims that: (1) plaintiff's senior vice president falsely represented that NCTC would pay the increased rate, (2) plaintiff is currently being unjustly enriched by accepting the higher rates from its subscribers and refusing to turn those amounts over to defendant, and (3) plaintiff violated the confidentiality provision by failing to take reasonable precautions to protect the exposure of MTVN's valuable proprietary information when filing this lawsuit. Defendant has failed, however, to demonstrate the absence of a material fact issue with respect to each of the allegations offered to support its claim that plaintiff has come to this court with unclean hands. To be sure, each of these allegations merely represents defendant's version of events, while plaintiff's version of the same facts differs considerably. That neither party agrees with the other's factual summary amply demonstrates the controverted nature of the facts giving rise to this litigation. Accordingly, because the court concludes that issues of material fact remain with respect to each aspect of defendant's "unclean hands" defense, summary judgment is inappropriate.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant's *motion* to dismiss or, in the alternative, for summary judgment (doc. 18) is denied.

IT IS FURTHER ORDERED THAT plaintiff is granted leave to amend its complaint in accordance with this order no later than January, 15, 1999.