OPINION OF THE COURT
Herman Cahn, J.
Petitioner moves to compel arbitration of a dispute between the parties (CPLR 7503) concerning respondent’s refusal to pay for certain facilities provided by petitioner.
Factual Allegations and Background
Petitioner Verizon New York Inc. and respondent Broadview Networks, Inc. are providers of telecommunications services. Under Telecommunications Act of 1996 (47 USC § 151 et seq. [the TC Act]), Verizon is an “incumbent local exchange carrier” (ILEC), and Broadview is a competitive “local exchange carrier” (CLEC) (see 47 USC § 153 [26]; § 251 [h]). The TC Act requires telecommunications carriers to interconnect their networks, in certain instances, so that a carrier’s customers can complete calls to customers on another carrier’s network (see 47 USC § 251 [a] [1]). To facilitate such interconnection, the TC Act entitles a CLEC to place, or “collocate,” certain of its own equipment within an ILEC’s central offices (see 47 USC § 251 [c] [6]).
A CLEC and an ILEC may enter into an “interconnection agreement,” after voluntary negotiations, which establishes the terms, conditions, and prices for services provided by the ILEC to the CLEC, relating to the collocation and interconnection of the CLEC’s equipment in the ILEC’s offices. Alternatively, the TC Act permits a CLEC to opt into, and adopt, an interconnection agreement which is already in existence between an ILEC and some other CLEC (see 47 USC § 252 [i]).
Beginning on or about December 18,1998, Verizon and Broad-view entered into four successive interconnection agreements. The fourth of those agreements (the Interconnection Agreement) — an agreement originally entered into by Verizon and AT&T Communications of New York, Inc., which Broadview subsequently opted into and formally adopted — became effective on July 20, 2003.
Verizon alleges that, beginning in June 1999, and pursuant to the four interconnection agreements, it has provided Broadview *348 with certain facilities, known as “voice grade cross-connects” (the cross-connects), which are used to connect Verizon’s equipment, and Broadview’s collocated equipment, in Verizon’s offices.[1] Verizon allegedly began to bill Broadview for the cross-connects in March 2002, but Broadview refuses to pay the charges, and claims that they are improper.
On November 3, 2003, based upon an arbitration provision contained in the Interconnection Agreement, Verizon served Broadview with a demand for arbitration of the dispute concerning specifically Broadview’s refusal to pay for the cross-connects. The demand alleges that Verizon is entitled to recover more than $10,000,000 from Broadview in charges and late fees.
Broadview has thus far refused to arbitrate the dispute. It filed a complaint with the Federal Communications Commission (FCC) on December 30, 2003, seeking to have the FCC declare that Verizon has violated the Communications Act of 1934, as amended (the Communications Act), by, inter alia: (1) imposing charges under a state tariff, filed with the New York Public Service Commission (PSC) (PSC Tariff No. 8), for collocation arrangements which Broadview ordered under a federal tariff (FCC Tariff No. 11); (2) imposing charges which are not listed in FCC Tariff No. 11; and (3) “backbilling,” or retroactively billing, charges from 20 to more than 30 months after such charges were allegedly incurred.[2]
Discussion
Neither party has cited, and the court’s research has not disclosed, any case which resolves the precise issue raised in this proceeding: whether, in the context of the telecommunications industry, a party may compel arbitration of a dispute concerning obligations governed by the terms of a filed tariff, on the basis of an arbitration agreement which is not contained in that tariff. However, for the following reasons, Verizon’s petition is granted, and Broadview is directed to proceed to arbitration.
*349 The Interconnection Agreement contains a written arbitration clause and. concerns a transaction involving interstate commerce. Therefore, as both parties agree, the Federal Arbitration Act (9 USC § 1 et seq. [FAA]) governs the proceeding (see 9 USC § 2; Matter of Diamond Waterproofing Co., Inc. v 55 Liberty Owners Corp., 6 AD3d 101, 104 [1st Dept 2004], lv granted 2 NY3d 822 [2004]). The FAA creates a “body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]” (Moses H. Cone Mem. Hosp. v Mercury Constr. Corp., 460 US 1, 24 [1983]). When considering a motion to compel arbitration under the FAA, a court must determine “(1) whether there exists a valid agreement to arbitrate at all. . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement” (Hartford Acc. & Indem. Co. v Swiss Reins. Am. Corp., 246 F3d 219, 226 [2d Cir 2001] [citation and internal quotation marks omitted]).
Broadview does not dispute that the parties entered into a valid, written agreement to arbitrate disputes between them, by reason of Broadview’s opting into, and adoption of, the Interconnection Agreement. The Interconnection Agreement provides that the parties thereto shall submit any dispute between them to an “Inter-Company Review Board,” and that, “[i]f the Inter-company Review Board is unable to resolve a non-service affecting dispute within thirty days (or such longer period as agreed to in writing by the Parties) of such submission, the Parties shall initiate an arbitration in accordance with the [American Arbitration Association] rules for commercial disputes” (Interconnection Agreement § 28.11.1 [4] [a]; [5] [a]).[3] The Interconnection Agreement provides, further, that “[d]ispute resolution under the procedures provided in this Section 28.11 shall be the exclusive remedy for all disputes between Verizon and [Broadview] arising out of this Agreement or its breach,” and that “Verizon and [Broadview] agree not to resort to any court, agency, or private group with respect to such disputes except in accordance with this Section 28.11” (id. § 28.11.1 [2] [a]).
The dispute which Verizon seeks to have arbitrated clearly falls within the broad scope of the arbitration agreement contained in the Interconnection Agreement, because it is a *350 dispute “arising out of [the Interconnection] Agreement or its breach.”[4] The Interconnection Agreement specifically provides (1) that “[t]o the extent required by Applicable Law, Verizon shall provide Collocation for the purpose of facilitating [Broad-view’s] Interconnection with facilities or services of Verizon,” and that “[s]uch Collocation shall be provided pursuant to Verizon’s applicable federal and state Tariffs as amended from time to time”; and (2) that “[Broadview] shall purchase Cross Connection to Verizon services or facilities as described in Verizon’s applicable Tariffs” (Interconnection Agreement §§ 13.1, 13.4). Thus, because the Interconnection Agreement sets forth both Verizon’s obligation to provide collocation to Broadview, and Broadview’s obligation to purchase “Cross Connection” to Verizon’s facilities, the parties’ dispute concerning Broadview’s obligation to pay for the cross-connects is a dispute “arising out of [the Interconnection] Agreement or its breach,” and is within the scope of the Interconnection Agreement’s arbitration clause.
Broadview contends that the parties’ dispute concerning the cross-connects does not arise out of the Interconnection Agreement, but, rather, out of the tariff(s) which, pursuant to the Interconnection Agreement, supply the rates, terms, and conditions under which Broadview purchased “Cross Connection” from Verizon. However, that contention is without merit. When an interconnection agreement contains a provision providing for a CLEC’s purchase of services at the rates and on the terms set forth in a tariff filed by the ILEC, and the CLEG makes such a *351 purchase, the CLEG “is acting through [the] interconnection agreement” (U.S. W. Communications, Inc. v Sprint Communications Co., L.P., 275 F3d 1241, 1251 [10th Cir 2002]).[5] “[T]he . . . provision does not eliminate [the] interconnection agreement[ ], but rather is part of [it],” and the CLEC’s purchase “at the rates and terms set forth in one or more of [the ILEC’s] tariffs does not result in abandonment of the interconnection agreement,” but “simply means that the interconnection agreement is amended to include the terms of the particular tariffs)” (id).[6]
Thus, even if the parties’ dispute concerning payment for the cross-connects arose out of the tariffs) referenced in the Interconnection Agreement, the dispute would necessarily have arisen out of the Interconnection Agreement, as well, because the terms of the tariffs) are part of the Interconnection Agreement (cf. National Union Fire Ins. Co. of Pittsburgh, Pa. v Younger Bros., Inc., 2001 WL 669042, *6, 2001 US Dist LEXIS 7880, *18 [SD NY, June 13, 2001] [noting that, where an arbitration clause in one agreement was “broadly drafted to encompass ‘all disputes’ ‘arising out of ” that agreement, and the terms of a second agreement were incorporated by reference into the first agreement, a dispute arising out of the second agreement would be within the scope of the arbitration clause contained in the first agreement]).
Broadview contends that the reference to “filed tariff doctrine” dictates that the parties’ dispute arose out of the filed tariffs), and not out of the Interconnection Agreement. Under the filed tariff doctrine, Broadview argues, the terms of a filed tariff exclusively define the contractual relationship between the parties who sell/purchase services pursuant to the tariff. Broadview asserts that, by deeming the parties’ dispute to be within the scope of the arbitration provision, the court would be impermissibly interjecting the arbitration provision into the tariffs).
The filed tariff doctrine, or filed rate doctrine, holds that the rate of a carrier, duly filed with a regulatory agency, is “the only *352 lawful charge and that [deviation from it is not permitted upon any pretext” (ICOM Holding, Inc. v MCI Worldcom, Inc., 238 F3d 219, 221 [2d Cir 2001] [citation and internal quotation marks omitted]). Accordingly, the doctrine “bars challenges to [the] rates, terms, and conditions set forth in a tariff filed with a regulatory agency” (Chladek v Verizon N.Y. Inc., 2003 WL 21305347, *3, 2003 US Dist LEXIS 9478, *7 [SD NY, June 6, 2003], affd 2004 WL 816376, 2004 US App LEXIS 7278 [2d Cir, Apr. 12, 2004]; see also Byan v Prudential Ins. Co. of Am., 242 AD2d 456, 456 [1st Dept 1997]). “The rights and liabilities defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier” (ICOM Holding, Inc. v MCI Worldcom, Inc., 238 F3d at 221 [citation and internal quotation marks omitted]), and thus, as some courts have stated, the terms of the tariff “conclusively and exclusively enumerate the rights and liabilities of the contracting parties,” i.e., the provider and purchaser of the services or facilities governed by the tariff (see e.g. Marcus v AT&T Corp., 138 F3d 46, 56 [2d Cir 1998] [citation and internal quotation marks omitted]).
The applicability of the arbitration provision to the within dispute does not depend upon the addition of an arbitration provision to, or the inteijection of the provision into, the applicable tariff(s). Rather, effect must be given to the arbitration provision because it is included in the Interconnection Agreement, an agreement separate and distinct from the tariffis), which Broadview freely and voluntarily entered into. As previously stated, when a CLEC purchases services or facilities from an ILEC pursuant to an interconnection agreement, and a provision in the interconnection agreement specifies that the purchase is being made on the terms set forth in a filed tariff, then the CLEC “is acting through [the] interconnection agreement” (U.S. W. Communications, Inc. v Sprint Communications Co., L.P., 275 F3d at 1251). “The parties remain bound by the interconnection agreement at all times, as anticipated by the [TC] Act” (id.).
Nor has Broadview articulated any basis for a conclusion that the application of the arbitration provision to the dispute would constitute an improper alteration or amendment of the tariff(s). Broadview does not allege that dispute resolution is specifically addressed by the tariff(s) (cf. American Tel. & Tel. Co. v Central Off. Tel., Inc., 524 US 214, 225 [1998]), or that the arbitration provision conflicts with or challenges any of the terms or conditions which are specifically set forth in the tariff. Rather, the *353 terms and conditions set forth in the tariff(s) remain precisely as they are, and, insofar as they are applicable, will conclusively and exclusively govern the parties’ dispute.[7]
Nor, finally, it is argued that the claim which Verizon seeks to arbitrate is itself barred by the filed tariff doctrine. Verizon apparently merely seeks to enforce, and to obtain the payment provided for in, the applicable tariffis), rather than to challenge any of the rates, terms, or conditions contained therein. Accordingly, enforcement of the arbitration provision would not violate the filed tariff doctrine.
Broadview interposes a first affirmative defense, that the parties’ dispute is not arbitrable. This defense is presumably based upon Broadview’s contention, set forth not in Broadview’s papers in opposition to Verizon’s petition, but in the complaint filed by Broadview with the FCC, that the FCC is the “appropriate forum” for resolution of the parties’ dispute, because “the charges at issue . . . directly relate to collocation[ ] arrangements applied for by Broadview under Verizon’s federal tariffs,” and because “[t]he interpretation of federal tariffs and the Communications Act, and their application, is a matter over which the FCC has particular expertise, such that the primary jurisdiction of the FCC to resolve the dispute is not in question” (Fabrizio affidavit, exhibit 3, 11 57).
Certain federal “statutory claims may not be appropriate for arbitration” (Gilmer v Interstate/Johnson Lane Corp., 500 US 20, 26 [1991]). However, the burden rests on Broadview to establish that the claim Verizon seeks to arbitrate would involve such an inarbitrable statutory claim (see id.). Broadview has failed to satisfy that burden.
Finally, the Interconnection Agreement itself provides a mechanism for dealing with any inconsistent rulings which may result “[i]f, for any reason, . . . any . . . federal or state regulatory agency exercises jurisdiction over and decides any dispute related to this Agreement” — e.g., if the FCC chooses to exercise jurisdiction over the complaint already submitted to it by Broad- *354 view — “and, as a result, a claim is adjudicated in both an agency proceeding and an arbitration proceeding” (Interconnection Agreement § 28.11.1 [2] [d]). The mechanism provides, essentially, that the agency ruling shall be binding upon the parties, and take priority over the arbitration ruling, which shall be binding, and survive, only to the extent that it can be reconciled with the agency ruling (see id.).
Conclusion, Order, and Judgment
For the foregoing reasons, it is hereby ordered and adjudged that petitioner’s application to compel arbitration is granted, and the parties are directed to proceed to arbitration — in accordance with section 28.11.1 of the Interconnection Agreement entered into by the parties, which became effective July 20, 2003 — of the parties’ dispute with regard to petitioner’s claim that it is owed payment for voice grade cross-connect, or termination, facilities which petitioner provided to respondent within 20 days after service of a copy of this decision.

. The same facilities are referred to as “cross-connects” by Verizon and as “terminations” by Broadview.

. Providers of interstate telecommunications services must file tariffs— i.e., “schedules showing all charges . . . and showing the classifications, practices, and regulations affecting such charges” — with the FCC (47 USC § 203 [a]). Carriers doing business in the State of New York must file certain tariffs with the New York Public Service Commission, pursuant to the New York Public Service Law.

. Verizon invoked the Inter-Company Review Board process, by letter dated August 12, 2003, but alleges that the parties were unable to resolve their dispute by that means within 30 days.

. Even if it were doubtful as to whether the dispute at issue falls within the scope of the arbitration agreement, which it is not, the court would be required to resolve such doubt in favor of arbitration. Although the FAA does not require parties to arbitrate when they have not agreed to do so, “federal policy strongly favors arbitration as an alternative dispute resolution process” CDavid L. Threlkeld & Co. v Metallgesellschaft Ltd. [London], 923 F2d 245, 248 [2d Cir 1991]). Accordingly, courts should “construe arbitration clauses as broadly as possible” (id. at 250), and any doubt or ambiguity as to the scope of the arbitration agreement should be resolved in favor of arbitration (see Mastrobuono v Shearson Lehman Hutton, Inc., 514 US 52, 62 n 8 [1995]; Matter of PricewaterhouseCoopers L.L.P. v Rutlen, 284 AD2d 200, 200 [1st Dept 2001]).
Moreover, because the arbitration provision contained in the Interconnection Agreement is broad rather than narrow in scope — referring to arbitration “all disputes . . . arising out of [the Interconnection] Agreement or its breach,” “[t]he strong policy in favor of arbitration is even stronger” (Clarendon Natl. Ins. Co. v Lan, 152 F Supp 2d 506, 514 [SD NY 2001]). “[T]here arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties’ rights and obligations under it” (ACE Capital Re Overseas Ltd. v Central United Life Ins. Co., 307 F3d 24, 34 [2d Cir 2002] [citation and internal quotation marks omitted]).

. This case addressed the question of whether certain interconnection agreements were in compliance with the TC Act, and did not involve an arbitration clause in a tariff or contract.

. Broadview’s complaint to the FCC itself concedes that “[a]n interconnection agreement establishes the contractual terms under which Verizon provides collocation and related services to Broadview ...” (Fabrizio affidavit, exhibit 3, If 8).

. One court noted that “[a]n arbitrator has no more power to alter a tariffs rate than does a judge; and because [the case of American Tel. & Tel. Co. v Central Off. Tel., Inc., 524 US 214 (1998)] treats conditions and other tariff terms as part of the rates, it may follow that an arbitrator must take the whole tariff as he finds it, in order to avoid any possibility of discriminatory application (that bugbear of rate-regulation systems, and the main target of the filed-rate doctrine).” (Metro E. Ctr. for Conditioning & Health v Qwest Communications Inti., Inc., 294 F3d 924, 929 [7th Cir 2002], cert denied 537 US 1090 [2002].)